1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9
10

| | |
|---|---|
| JAMES MATHEWS, | CASE NO. 3:21-cv-05732-LK |
| Plaintiff, | ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT |
| v. | |
| KARCHER NORTH AMERICA, INC., | |
| Defendant. | |

        This matter comes before the Court on Kärcher North America, Inc.'s Motion for Summary Judgment. Dkt. No. 26. Kärcher terminated Plaintiff James Mathews' employment in April 2019, and this lawsuit arises from their dispute about the reason for Mathews' termination. Kärcher argues that Mathews was discharged after he was disrespectful to his supervisor and incurred an unauthorized charge for a training course. Mathews argues that Kärcher retaliated after he investigated sexual harassment complaints, advocated for a raise for another employee, and alleged that he had experienced discrimination. Mathews asserts three claims against his former employer: retaliation under the Washington Law Against Discrimination ("WLAD"), wrongful discharge in violation of public policy, and negligence.

1      For the reasons set forth below, the Court grants in part and denies in part Kärcher's

2  motion.[1]

## I.   BACKGROUND

4      Throughout his employment with Kärcher from 2014 through April 2019, Mathews

5  worked as a Senior Human Resources Generalist in Camas, Washington. Dkt. No. 36 at 1.

6  **A.    Mathews' Tumultuous Relationship with His Supervisor**

7      Mathews' supervisor from 2016 until his termination was Lauren Choate, the Executive

8  Vice President of Human Resources. *Id.*; Dkt. No. 26-4 at 1. Although Mathews had very little

9  contact with Choate, he felt their working relationship was "challenging." Dkt. No. 26-1 at 13.

10     In 2016, the human resources team at the company's headquarters sent a written complaint

11 to the company's chief executive officer and chief financial officer complaining about Choate's

12 perceived lack of competency and tendency to yell at others. *Id.* Mathews was tasked with

13 investigating the complaint, and Choate was "upset" that Mathews' report did "not speak well [of]

14 her leadership." *Id.* at 14–15. Mathews also had "serious reservations about her performance," and

15 he did not keep that opinion to himself. *Id.* at 24. He shared his complaints about her, which did

16 not put him "in her good stead." *Id.* at 26.

17     Mathews also believed that Choate undervalued his contributions. *Id.* at 33. In 2017,

18 Choate promoted Kristin Conlon, a female senior HR generalist, to a manager position. *Id.* at 16.

19 Mathews had to report to Conlon, and he "didn't think it was particularly fair" because Choate had

20 not posted the position and had disregarded his desire for advancement. *Id.* at 16–17. Mathews

21 informed Choate that he would look for other employment, but after Conlon left the company,

22 Mathews expressed interest in resuming discussions about his career with the company. *Id.* at 17.

23

24 ──────────────
[1] Because the Court can decide the matter on the parties' filings, it denies Mathews' request for oral argument.

**B.      Kärcher's Consolidation Of Its Operations**

In July 2017, Mathews began hearing rumors that the Camas facility might close, and he expressed interest in remaining with the company and potentially relocating if needed. *Id.* at 21–22. In April 2018, Choate offered Mathews an HR Manager position in Denver to lead human resources at both the Camas facility and Kärcher's facility in Englewood, Colorado. Dkt. No. 36 at 2. Mathews made a counteroffer, requesting a higher salary. *Id.*[2] Mathews subsequently made a second counteroffer to accept the position but perform it remotely from Washington. Dkt. No. 26-1 at 28. Choate paused the negotiations "because of an imminent announcement from Kärcher about the closure of some of its facilities." Dkt. No. 26-4 at 2.

In July 2018, Kärcher announced that its Camas, Washington facility would close and its Englewood, Colorado facility would be consolidated with its Denver headquarters into a new facility in Aurora, Colorado. *Id.* Kärcher sent a memorandum to its Camas-based managers so they could understand their "post-employment arrangements." Dkt. No. 36-2 at 2. Kärcher promised to "inform [employees] at least 90 days prior to [their] expected Last Day Worked in Camas." *Id.* Among other benefits, the memorandum referenced the company's updated tuition reimbursement policy, which Kärcher later accused Mathews of violating and used to justify his termination. *Id.*

Because of the central role the policy would later play, a brief recitation of its context and provisions is warranted. The memorandum to managers "encourage[d]" employees to "take full advantage of" the company's tuition reimbursement policy, explained that Camas employees could "sign up for any course [they] choose," and stated that as long as employees worked until their last day with the company, they would not be required to pay back the tuition expenses. *Id.* at 3. The accompanying one-page handout explained that the benefit "helps pay for the cost of outside

---

[2] Mathews requested a higher salary based on his understanding of the compensation paid to two female employees. Dkt. No. 36 at 2. He does not allege that he complained about salary disparities at that time.

courses that relate to your current position," and could cover "training, certification and education programs the employee elects which will support their next career choice within or outside the company." *Id.* at 6. It further stated that reimbursement was "available at the rate of 100% of the cost of tuition at an accredited educational institution, with a maximum of $5250 per calendar year." *Id.* The document further provided that "[i]n order to request educational assistance benefits, you must complete Section A of the Application for Tuition Reimbursement form and submit it to your Supervisor for approval." *Id.* The request would then be reviewed and approved by the employee's department manager and human resources. *Id.*

Due to the consolidation of operations, the HR Manager position Choate previously offered Mathews in Englewood was no longer needed and was never filled. Dkt. No. 26-4 at 2. By email dated September 3, 2018, Choate notified Mathews that the company would not have a comparable role for him at the new Aurora facility. Dkt. No. 36-1 at 2. She expressed her hope that he would remain with Kärcher, "supporting [his] Camas-based colleagues through this transition/relocation over the next 15 months or so." *Id.* At that point, Mathews knew that transferring to the new facility was not an option for him and he would no longer have a position with the company once the Camas facility closed. Dkt. No. 26-1 at 31. He anticipated that the facility would close in the first or second quarter of 2020 and intended to stay with the company through the closure. *Id.*

## C.   Mathews' Investigation Of Sexual Harassment Complaints

Around July 31, 2018, Mathews received a complaint of sexual harassment against a vice president of Kärcher. Dkt. No. 36 at 3. The vice president was a direct subordinate of Kärcher's Executive Vice President of Operations, Claus Schroeder. *Id.* Choate and Mathews met with the complainant, and Choate stated that she would follow up with Schroeder to address the complaint with him directly. *Id.* On November 15, 2018, Mathews received a second complaint—from a different woman—about the same alleged harasser. *Id.* Choate instructed Mathews to brief

Schroeder on the second complaint, but when he did so, he learned that Choate had not informed Schroeder of the first complaint. *Id.*

Mathews investigated both complaints and prepared a report for Choate. *Id.* at 4. The alleged harasser was subsequently discharged. *Id.* On November 28, 2018, Choate commended Mathews in an email to company executives for his "excellent work" and completion of a professional and thorough investigation. *Id.*; Dkt. No. 26-13 (email from Choate writing that she assured the executives that Mathews "would provide a very professional summary and conduct an appropriate and thorough investigation—and [he] did exactly that. It is very much appreciated and needed. Thank you again for this excellent work."). Nevertheless, Mathews complained to Schroeder on December 18, 2018 that Choate had "totally dropped the ball" on the first harassment allegation by failing to report it to Schroeder. Dkt. No. 26-1 at 9; Dkt. No. 26 at 7.

**D.   Mathews' and Choate's Continued Disagreement and Mathews' Complaint**

In September 2018, Mathews and Choate disagreed about whether to offer a raise to try to retain Colton Hasart, a male HR Assistant at the Camas facility. Dkt. No. 36 at 4. Mathews proposed raising Hasart's salary "to the same level as a female employee who had been hired in the same role, but Ms. Choate opposed paying him that much." *Id.*; *see generally* Dkt. No. 36-3 (agreeing to pay the employee a higher base salary but not a retention bonus to stay through the facility closure; noting that one of the female employees held a different professional degree and the other was functionally at a different level).

The same month, Mathews began updating Kärcher's paid sick leave policy to conform to new Washington state requirements. Dkt. No. 36 at 4. Mathews sent Choate his summary proposal on October 22, 2018. *Id.* She asked him to pause the work for uniformity while employees at the company's New Jersey facility revised their policy, and Mathews sent her a proposed draft on December 31, 2018. *Id.* at 4–5. In his declaration responding to Kärcher's summary judgment

motion, Mathews noted that Choate "insisted" on a policy change that was less generous to employees, and "[u]nbeknownst to [him], Ms. Choate was communicating with Kärcher's counsel regarding the changes and receiving feedback from him," which Choate "finally" shared with Mathews on January 14, 2019. *Id.* at 5.

In December 2018, Mathews told Schroeder that his working relationship with Choate was "challenged," a comment Schroeder apparently relayed to Choate. Dkt. No. 26-1 at 37–38. Choate felt that she and Mathews "were not working well together" and their "communication was strained," so while she and Schroeder were visiting the Camas facility on January 24, 2019 and meeting individually with other employees, she "insisted" that Mathews meet with them. Dkt. No. 36 at 5; Dkt. No. 26-4 at 2; Dkt. No. 26-1 at 34. Mathews responded that he "saw no purpose in having an in-depth discussion about [his] future plans since Ms. Choate had already made it clear there were no positions for him in Colorado." Dkt. No. 36 at 5. Mathews also expressed his "frustration that she had not been fair to [him] in choosing who would be retained after the Camas closure." *Id.* Choate asked Mathews if he wanted an earlier departure from the company with three months' severance pay. Dkt. No. 26-4 at 2; Dkt. No. 26-1 at 34. Mathews perceived that offer as a threat "of a 90-day termination notice," delivered "in a loud and angry voice." Dkt. No. 36 at 5; Dkt. No. 26-1 at 38. After that meeting, the two exchanged emails, and Mathews was offended that Choate seemed to be misrepresenting their January exchange. Dkt. No. 26-1 at 40. Given their "communication challenges" and what Choate perceived as "a lot of anger towards [her] from [Mathews]," she directed him to cancel his planned trip to attend the upcoming Kärcher HR conference, and he participated only by WebEx. Dkt. No. 26-1 at 41; Dkt. No. 36 at 6.

On February 26, 2019, Mathews' attorney sent a letter to the company alleging that Mathews had been subjected to discrimination at Kärcher. *See generally* Dkt. No. 26-20. The letter alleged that he had been "subjected to discrimination by Ms. Choate based on his age and sex. This

discrimination has taken the form of unfair discharge/layoff, refusal to promote, and different terms and conditions of employment." *Id.* at 2.[3] He alleged that younger, female employees who were less qualified were "promoted ahead of him, given higher salaries, and . . . offered positions at Kärcher's Englewood facility." *Id.* Mathews sought the following relief to resolve his claims without litigation:

> 1. That Kärcher conduct a complete and thorough investigation into Ms. Choate's practices and behavior during her tenure with the company[;]

> 2. If, after conducting this investigation, Kärcher determines it will terminate or reassign Ms. Choate, then Kärcher will retain Mr. Mathews at Kärcher's headquarters in a position that is not subordinate to Ms. Choate[;]

> 3. If, after conducting this investigation, Kärcher determines it will retain Ms. Choate, Mr. Mathews shall be paid [amount redacted]. While Mr. Mathews is entitled to damages for the emotional distress that he has suffered due to Ms. Choate's discriminatory acts, he is not demanding any such damages at this time; and

> 4. Kärcher will pay Mr. Mathews' attorney fees to date.

*Id.* at 10–11. Because Choate was the subject of Mathews' letter, she was "removed from any involvement or decision-making authority related to responding to the letter." Dkt. No. 26-8 at 2. Instead, it was reviewed by two other company executives: Javier Gonzalez, Kärcher's Chief Executive Officer, and Jason Mangone, Kärcher's Chief Financial Officer. Dkt. No. 26-8 at 1–2; Dkt. No. 26-9 at 1–2.[4] Both determined that it was not a "feasible option" to relocate Mathews to Colorado and have him continue to work in human resources without reporting to Choate. Dkt. No. 26-8 at 2; Dkt. No. 26-9 at 2. Kärcher responded to Mathews' letter, disagreed with the facts alleged therein, including the comparator information Mathews "[c]herry-pick[ed]," denied wrongdoing, and offered Mathews a severance package including three months' salary in exchange

---

[3] Mathews was 63 years old when his employment with Kärcher ended. Dkt. No. 36 at 2.

[4] Kärcher received the February 26, 2019 letter on March 6, 2019. Dkt. No. 26-21 at 1.

1  for a release of claims. Dkt. No. 26-21 at 1–3 (March 27, 2019 letter).

2  **E.    Kärcher's Discharge of Mathews and Acceleration Thereof**

3          Around April 11, 2019, Choate learned that Mathews had incurred an unapproved expense

4  for a Society for Human Resource Management ("SHRM") training course when he submitted the

5  fee to Kärcher for reimbursement. Dkt. No. 26-4 at 2. Mathews had not asked Choate to approve

6  the expense before he incurred it and she says that if he had, she would not have approved it

7  "because of Kärcher's budget cuts that year." *Id.* 2–3. When Choate questioned the expense and

8  Mathews' failure to seek preapproval, Mathews responded that the training was necessary for him

9  to maintain his professional certification and he "did not seek prior approval . . . because this same

10 training event was approved two years ago." Dkt. No. 26-23 at 4–5; Dkt. No. 36 at 8–9 (Mathews

11 explaining that he needed to complete continuing education classes to maintain his certification,

12 which "improved [his] marketability to potential employers"). Choate initially denied the expense,

13 but ultimately approved it after Mathews complained that it was too late to cancel and he would

14 have to pay the expense personally. Dkt. No. 26-23 at 1–2; Dkt. No. 26-25 at 1.

15         Gonzalez and Mangone decided to terminate Mathews' employment "after learning that

16 [he] incurred an unapproved charge of $650.00 shortly after he received Kärcher's response letter

17 of March 27, 2019." Dkt. No. 26-8 at 2; *see also* Dkt. No. 26-9 at 2. As a result of Mathews'

18 actions, both executives lost "trust and confidence that Mr. Mathews was acting with Kärcher's

19 best interests in mind, or that he was acting in good faith." Dkt. No. 26-8 at 2; *see also* Dkt. No.

20 26-9 at 2. Choate was not involved in the decision to terminate Mathews' employment. Dkt. No.

21 26-4 at 3; Dkt. No. 26-8 at 3; Dkt. No. 26-9 at 2.

22         On April 22, 2019, Choate informed Mathews of his termination. Dkt. No. 36 at 7.

23 According to Mathews, she did not give a reason for his termination, "only alleged that [Mathews]

24 had been 'disrespectful' to her and Kärcher," and refused to provide examples. *Id.* She told

Mathews that he did not need to work any further but could stay on the payroll through the end of the month. Dkt. No. 26-4 at 3.

Mathews' last day with Kärcher was moved up from May 3, 2019 to April 30, 2019 "after a second unapproved charge on his company credit card was discovered." *Id.* That $100 charge was for his SHRM certification. Dkt. No. 26-25 at 1. Gonzalez and Mangone approved the decision to expedite his termination, and Choate communicated it to Mathews. Dkt. No. 26-4 at 3; *see also* Dkt. No. 26-8 at 3; Dkt. No. 26-9 at 3.

**F.     Mathews' Lawsuit**

Mathews filed suit in Clark County Superior Court on April 9, 2021. Dkt. No. 1-1 at 1. His complaint asserts three claims:

> 1. retaliation under the WLAD "because he opposed unlawful sex and age discrimination practices;"
>
> 2. wrongful termination in violation of public policy for the same reason; and
>
> 3. negligence based on Kärcher's alleged failure "to hire, train, supervise and discipline its employees or agents in a fashion that assures compliance with federal and states laws," or to use reasonable or ordinary care to avoid violating his rights, and for breaching its duties to Mathews by terminating his employment in violation of his rights.

*Id.* at 5–6. Kärcher was served on September 10, 2021 and timely removed this case to federal district court on October 4, 2021. Dkt. No. 1 at 2.

## II.   DISCUSSION

The Court first addresses its jurisdiction before turning to Mathews' claims. The Court also notes that although Mathews' February 2019 letter asserted claims of discrimination based on age and sex, he is not pursuing those claims in this case. Dkt. No. 26-20 at 3–5; Dkt. No. 26-1 at 18 (explaining that he does not know if he was discriminated based on his age or sex); Dkt. No. 35 at 1 (setting forth the claims he is pursuing).

For the reasons set forth below, the Court finds that genuine issues of material fact preclude summary judgment on Mathews' claims for retaliatory and wrongful discharge relating to one of his theories of retaliation. Kärcher is entitled to summary judgment on his other theories of retaliation and on his negligence claim.

**A.    Jurisdiction**

Federal jurisdiction exists over all civil actions where the matter in controversy exceeds $75,000 and the action is between citizens of different states. 28 U.S.C. § 1332(a). "The strong presumption against removal jurisdiction means that the defendant always has the burden of establishing that removal is proper." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (per curiam) (quotation marks omitted).

Kärcher has met that burden even though the complaint does not allege a specific amount of damages. *See generally* Dkt. No. 1-1. As Kärcher notes, *see* Dkt. No. 1 at 3, Mathews could be entitled to back pay, front pay, non-economic damages, and attorney fees if he prevails. *See, e.g.*, *Martini v. Boeing Co.*, 971 P.2d 45, 55 (Wash. 1999); Dkt. No. 1-1 at 6–7 (seeking compensatory damages, attorney fees, and costs). And compensatory damages and attorney fees count towards the "amount in controversy" calculation. *Fritsch v. Swift Transp. Co. of Ariz., LLC*, 899 F.3d 785, 793 (9th Cir. 2018). Mathews was discharged on April 30, 2019, and his annual salary at the time was $97,325.28. Dkt. No. 2 at 1–2. Thus, his back pay alone could exceed the jurisdictional threshold. In addition, the parties are citizens of different states: Mathews is a citizen of Nevada, Dkt. No. 1-1 at 1,[5] and Kärcher is incorporated in Delaware with its principal place of business in

---

[5] The complaint and notice of removal state that Mathews is a "resident of Nevada." Dkt. No. 1-1 at 1; Dkt. No. 1 at 3. That statement, standing alone, may be insufficient to establish his citizenship, but Mathews confirmed in his deposition that he has been living in Nevada since March 2020, indicating that he is a citizen of that state. Dkt. No. 26-1 at 1, 53 (deposition in October 2022); *see also Kanter v. Warner-Lambert Co.*, 265 F.3d 853, 857 (9th Cir. 2001) (for purposes of diversity jurisdiction, an individual's state citizenship is determined by one's domicile or permanent home, not state of residence); *see also Ehrman v. Cox Commc'ns, Inc.*, 932 F.3d 1223, 1227 (9th Cir. 2019) ("[R]esidency is not equivalent to citizenship.").

1   Colorado, Dkt. No. 1 at 3. Therefore, this Court has jurisdiction under 28 U.S.C. § 1332.

2   **B.    Meet and Confer Requirement**

3           This Court's Standing Order for all Civil Cases requires parties to meet and confer before

4   filing a dispositive motion. Kärcher certifies that it "attempted to discuss the grounds for this

5   motion and the relief requested with counsel for Mr. Mathews, both by email and by telephone, on

6   December 6, 7, and 12, 2022," but "Mr. Mathews' counsel has not responded to Kärcher's attempts

7   to confer." Dkt. No. 26 at 1. Mathews does not even address this issue in his response. *See*

8   *generally* Dkt. No. 35. The Court cautions Mathews' counsel that it "expect[s] a high degree of

9   professionalism from the lawyers practicing before [it]," including diligent and meaningful meet

10  and confers where required. *See* Local Civil Rules Introduction. The Court will sanction counsel

11  for such failings in the future. LCR 11(c).

12  **C.    Summary Judgment Standard**

13          Summary judgment is appropriate only when "the movant shows that there is no genuine

14  dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

15  Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this

16  stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the

17  evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-

18  sided that one party must prevail as a matter of law." *Id.* at 251–52. And to the extent that the Court

19  resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where

20  the facts specifically averred by that party contradict facts specifically averred by the movant, the

21  motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

22          The Court will, however, enter summary judgment "against a party who fails to make a

23  showing sufficient to establish the existence of an element essential to that party's case, and on

24  which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

1    (1986). Once the moving party has carried its burden under Rule 56, "the nonmoving party must

2    come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec.*

3    *Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis, internal quotation,

4    and citation omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific

5    allegations, *Lujan*, 497 U.S. at 888–89.

6    **D.     Mathews' WLAD Retaliation Claim**

7           The WLAD "prohibits an employer from retaliating against an employee for opposing any

8    discriminatory practices forbidden by the WLAD." *Mackey v. Home Depot USA, Inc.*, 459 P.3d

9    371, 381 (Wash. Ct. App. 2020) (citing Wash. Rev. Code § 49.60.210). "Violation of this provision

10   supports a retaliation claim." *Id.*

11          Where, as here, an "employee lacks direct evidence, Washington has adopted the three step

12   evidentiary burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*[.]"[6] *Id.*

13   Under that framework, the employee first must establish a prima facie case of retaliation. *Id.* To

14   do so, an employee must show: (1) that the employee took a statutorily protected action, (2) that

15   the employee suffered an adverse employment action, and (3) a causal link between the employee's

16   protected activity and the adverse employment action. *Cornwell v. Microsoft Corp.*, 430 P.3d 229,

17   234 (Wash. 2018).

18          Once the plaintiff establishes a prima facie case, the burden shifts to the employer to

19   produce evidence of a legitimate, non-retaliatory reason for the adverse employment action. *See*

20   *Boyd v. State, Dep't of Soc. & Health Servs.*, 349 P.3d 864, 869 (Wash. Ct. App. 2015). If the

21   employer does so, the burden shifts back to the employee to produce evidence that the employer's

22   proffered reason was pretextual. *Id.*

23

24   ───────────────
     [6] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

1      "Claims arising under the WLAD are typically inappropriate for resolution at summary

2  judgment because the WLAD mandates liberal construction and the evidence will generally

3  contain reasonable but competing inferences of both discrimination and nondiscrimination that

4  must be resolved by a jury." *Gamble v. City of Seattle*, 431 P.3d 1091, 1094 (Wash. Ct. App. 2018)

5  (cleaned up). The Court will, however, grant summary judgment against an employee who "fails

6  to raise a genuine issue of fact on one or more prima facie elements." *Johnson v. Chevron U.S.A.,*

7  *Inc.*, 244 P.3d 438, 443 (Wash. Ct. App. 2010); *see also Marquis v. City of Spokane*, 922 P.2d 43,

8  48 (Wash. 1996) (to survive summary judgment, the employee "must do more than express an

9  opinion or make conclusory statements," and "must establish specific and material facts to support

10  each element of his or her prima facie case").

11      1.  <u>Mathews' Prima Facie Case</u>

12      Kärcher does not dispute that Mathews satisfies the first two elements of his prima facie

13  case, Dkt. No. 26 at 17, and the Court finds that both are met.

14          *(a) Mathews Engaged in Protected Activity*

15      The parties agree that regardless of the merits of the underlying complaints, Mathews

16  engaged in protected activity by "expos[ing]" Choate's alleged mishandling of the first sexual

17  harassment complaint in his November 2018 report and in his December 2018 complaint about

18  that issue to Schroeder, and by complaining that he had been discriminated against in his February

19  2019 letter. *Id.*; *see also* Dkt. No. 35 at 13, 15; *see, e.g., Smith v. Clover Park Sch. Dist. No. 400*,

20  No. 3:21-cv-05767-JHC, 2022 WL 17740327, at *11 (W.D. Wash. Dec. 16, 2022) ("Washington

21  courts have held that reporting what one reasonably believes to be a discriminatory activity is

22  protected, regardless of whether the practice is unlawful."); *see also Mackey*, 459 P.3d at 383

23  ("Complaining about discriminatory conduct is statutorily protected activity."). Mathews also

24  alleges—and Kärcher does not dispute—that he engaged in protected activity in September 2018

1    by advocating for a male employee to "be paid the same salary as a recently hired female

2    employee." Dkt. No. 35 at 13. The Court assumes without deciding that that activity was also

3    protected.

4                    *(b) Mathews Experienced Adverse Actions*

5            Turning to the second element, Kärcher does not dispute that Mathews experienced an

6    adverse action, but it does not address which actions were adverse. Dkt. No. 26 at 17. Certainly,

7    Mathews' discharge was an adverse action. *Crownover v. State ex rel. Dep't of Transp.*, 265 P.3d

8    971, 980 (Wash. Ct. App. 2011) (noting that adverse actions include firing employees). Mathews

9    also avers that he suffered an adverse action when Choate threatened him with a 90-day

10   termination notice in January 2019. Dkt. No. 35 at 13. Kärcher disputes that the threat was an

11   adverse action in its reply brief. Dkt. No. 38 at 4. Depending on the context, a threat could

12   constitute an adverse action if it would "dissuade[] a reasonable worker from making or supporting

13   a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53,

14   68 (2006) (cleaned up); *Hellman v. Weisberg*, 360 F. App'x 776, 779 (9th Cir. 2009) (explaining

15   that the plaintiff was never fired or prosecuted, and "the mere threat of termination does not

16   constitute an adverse employment action."). The Court assumes without deciding that the threat

17   was an adverse action here, but as set forth below, the claim fails based on the lack of evidence of

18   pretext.

19           Mathews also complains that he suffered an adverse action when his final day of

20   employment was accelerated after he complained to Choate that she "was not treating [him] fairly."

21   Dkt. No. 36 at 8. This accelerated termination constitutes an adverse action because it caused

22   Mathews to lose his health insurance for May 2019. *Id.*; *see Espinoza v. City of Seattle*, 458 F.

23   Supp. 3d 1254, 1271 (W.D. Wash. 2020) (materially adverse action is one that "significantly alters

24   the terms and conditions of an employee's job, such as termination, demotion accompanied by a

1    decrease in pay, or a material loss of benefits or responsibilities" (cleaned up)).[7]

2              *(c)  Mathews Has Established a Causal Connection for Certain Adverse Actions*

3              With the first two elements of Mathews' prima facie case established, the Court examines

4    whether there was a causal link between his protected activity and the adverse actions. This issue

5    presents a "fairly low bar." *Mackey*, 459 P.3d at 388; *see also Cornwell*, 430 P.3d at 235 (to prove

6    the causal element, a plaintiff must show that retaliation was a "substantial factor" motivating the

7    employer's adverse action); *Currier v. Northland Servs.*, 332 P.3d 1006, 1013 (Wash. Ct. App.

8    2014) ("[R]etaliation need not be the main reason behind the [adverse action] but instead need

9    only be the reason that 'tips the scales' toward [it]." (quoting *Wilmot v. Kaiser Aluminum & Chem.*

10   *Corp.*, 821 P.2d 18, 31 (Wash. 1991))).

11             As Mathews argues, Dkt. No. 35 at 14, "[c]ausation can be inferred from timing alone

12   where an adverse employment action follows on the heels of protected activity." *Villiarimo v.*

13   *Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002); *Mackey*, 459 P.3d at 384; *Vasquez v.*

14   *State*, 974 P.2d 348, 353 (Wash. Ct. App. 1999) ("Among the factors suggesting retaliatory

15   motivation is proximity in time between the discharge and the protected activity[.]"). Mathews has

16   not demonstrated any causal connection between his advocacy for a raise for Hasart in September

17   2018 and the January 2019 threat or his April 2019 termination, which occurred four and seven

18   months later, respectively. That length of time, by itself, is insufficient to create an issue of fact

19   regarding causation. *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (per

20   curiam) (noting that courts that "accept mere temporal proximity between an employer's

---

21

22   [7] In his declaration, Mathews also complains that Choate stated to prospective employers that he was ineligible for
     rehire, Dkt. No. 36 at 8, but his response to this motion does not argue that the allegedly negative reference constituted
     an adverse action, Dkt. No. 35 at 13 (listing alleged adverse actions). Even if Mathews had properly presented this
23   argument to the Court, the reference does not reach the level of an adverse action because Mathews presents no
     evidence that it was actually communicated to any prospective employers or that he lost job opportunities because of
     it. Dkt. No. 26-1 at 56–58 (explaining that he paid a company to find out what Kärcher might say in response to a
24   reference check but he does not know if the reference was shared with prospective employers).

knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close'" and citing cases finding three and four-month periods insufficient); *Wilmot*, 821 P.2d at 29 ("Discharge some length of time after the employee's [protected activity] will be less likely to reflect an improper motive[.]"). Nor does Mathews provide any other evidence to tie that advocacy to the threat or his discharge. And his attempt to forge a connection between it and his discharge suffers from another problem: there is no evidence that Gonzalez and Mangone, who made the discharge decision,[8] knew anything about the issue. Absent that knowledge, the advocacy could not have motivated their decision. *See, e.g.*, *Mackey*, 459 P.3d at 384 (explaining that to prove causation, the employee "must show that the employer had knowledge that the employee had engaged in protected activity."); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982) (same).

However, the temporal proximity between Mathews' reports in November and December 2018 that Choate dropped on the ball on the first sexual harassment complaint and her January 24, 2019 90-day termination "threat," Mathews' discharge, and the acceleration thereof are much closer. Kärcher argues that the length of time between Mathews' protected activity in November and December 2018 and his termination in April 2019 is too long to infer causation. Dkt. No. 26 at 18. But Choate's January 2019 termination threat—and her adjoining explanation that Mathews had "made it clear to at least Claus [Schroeder], and potentially others, that our working relationship is challenged," Dkt. No. 26-18 at 2; Dkt. No. 26-1 at 37–38—was delivered only one month after Mathews complained to Schroeder that Choate "dropped the ball" on the first sexual

---

[8] Mathews repeatedly states that Choate made the decision to discharge him, but cites nothing in support of that assertion. Dkt. No. 35 at 15, 25. Nor does he rebut the declarations of Gonzalez and Mangone stating that they were the ones who made the decision. *See* Fed. R. Civ. P. 56(c) (setting forth a party's burden to dispute a fact, including by citing to the record to support its position).

harassment complaint in mid-December 2018. Dkt. No. 26-1 at 9; Dkt. No. 26-12 at 1 (Schroeder indicated on December 18, 2018 that "he advised both Jason [Mangone] and Javier [Gonzalez] of [Choate] dropping the ball"); Dkt. No. 36 at 5. And the April 15, 2019 discharge decision—with the subsequent acceleration of his departure date—occurred only five to seven weeks, respectively, after the company received the letter from his attorney alleging discrimination on March 6, 2019. Dkt. No. 36 at 6–7; Dkt. No. 26-21 at 1; Dkt. No. 26-8 at 2.[9] In these circumstances, such close proximity in time can support an inference of causation. *See Mackey*, 459 P.3d at 388; *see also Erickson v. Biogen, Inc.*, 417 F. Supp. 3d 1369, 1383 (W.D. Wash. 2019) (one month between protected activity and adverse employment action was sufficient proximity to establish causation). In addition, the same two executives who Schroeder advised of Choate dropping the ball and who determined how to respond to Mathews' complaint letter also made the discharge decision and approved[10] the acceleration of his termination. Dkt. No. 26-8 at 2; Dkt. No. 26-9 at 2; Dkt. No. 26-12 at 1; *see Currier*, 332 P.3d at 1013 ("[I]f an employee establishes that he or she participated in statutorily protected opposition activity, the employer knew about the opposition activity, and the employee was then discharged, a rebuttable presumption of retaliation arises that precludes summary dismissal of the case" at the prima facie stage); *Mackey*, 459 P.3d at 387–88 (explaining that temporal proximity may be sufficient at the causal connection stage but not at the pretext stage).[11]

---

[9] Kärcher does not identify when it decided to accelerate Mathew's departure date, but the decision seems to have been made around April 24, 2019 and at least by April 30, 2019. Dkt. No. 26-25 at 2; Dkt. No. 26-8 at 3; Dkt. No. 26-9 at 3.

[10] Whether Gonzalez and Mangone "made" the decision to expedite Mathews' termination as Choate contends, Dkt. No. 26-4 at 3, or whether they "approved" that decision as they aver, Dkt. No. 26-8 at 3; Dkt. No. 26-9 at 3, is irrelevant because regardless, Kärcher has supplied a legitimate reason for the decision that Mathews has not rebutted, as set forth below.

[11] A causal connection can also be demonstrated by "satisfactory work performance and evaluations before the discharge," *Currier*, 332 P.3d at 1013, and the parties dispute the quality of Mathews' performance and evaluations, Dkt. No. 26 at 7–8; Dkt. No. 35 at 5, 8, 15–16. However, the issue is irrelevant for purposes of this motion because

1    Kärcher argues that there is no causal connection between Mathews' protected activity and

2  his termination because the die had already been cast in September 2018 when Choate informed

3  Mathews that he would not be retained after the closure of the Camas facility. Dkt. No. 26 at 17.

4  However, that argument ignores the fact that Mathews intended to stay with the company through

5  the closure of the Camas facility but was discharged approximately a year earlier. Dkt. No. 26-1

6  at 31. The reality that Mathews was not going to be retained long term does not exclude the

7  possibility that his earlier discharge was motivated by retaliation for his intervening protected

8  activity.

9    In sum, Mathews has established a prima facie case of retaliation based on Choate's

10  "threat," his discharge, and the subsequent moving up of his discharge date.

11        2.  Kärcher's Nonretaliatory Reasons

12    Kärcher has proffered "legitimate . . . nonretaliatory reason[s]" for threatening termination

13  and ultimately terminating and accelerating Mathews' employment. *Renz v. Spokane Eye Clinic,*

14  *P.S.*, 60 P.3d 106, 109 (Wash. Ct. App. 2002).

15    Choate offered Mathews an early termination with three months' severance because she

16  "felt that [the two] were not working well together and that [their] communication was strained[.]"

17  Dkt. No. 26-4 at 2. Mathews does not dispute that characterization of their working relationship,

18  and as set forth in the section below, he echoed it. "[A] dysfunctional professional relationship"

19  can constitute a legitimate, nondiscriminatory reason for an employee's discharge. *Mikkelsen v.*

20  *Pub. Util. Dist. No. 1 of Kittitas Cnty.*, 404 P.3d 464, 474 (Wash. 2017).

21    Gonzalez and Mangone decided to discharge Mathews after he incurred an unauthorized

22  charge, causing them "to lose trust and confidence" in him. Dkt. No. 26-8 at 2; Dkt. No. 26-9 at 2.

23

24  Kärcher does not allege that it took any action based on his performance, and Mathews has established a causal
connection even without considering his allegedly satisfactory performance.

Then they approved accelerating his termination date after learning that he had incurred a second unauthorized charge on his company credit card. *Id.* at 3; *see also* Dkt. No. 26-25 at 2. Incurring unauthorized charges and loss of trust in an employee can also constitute legitimate reasons for terminating employment. *See, e.g.*, *Brockbank v. U.S. Bancorp*, 506 Fed. App'x 604, 606 (9th Cir. 2013) (employer presented a legitimate reason for termination where employee had used a company credit card for personal charges); *Huck v. Kone, Inc.*, No. C10-01845-RS, 2011 WL 6294466, at *7 (N.D. Cal. Dec. 15, 2011) (violating company policy and charging a personal rental car to the company's business account were legitimate reasons for termination); *Solomon v. Bank of Am. Corp.*, No. CV12-8257-DSF-(AJWx), 2013 WL 4500451, at *4 (C.D. Cal. Aug. 21, 2013) (holding that defendant had supplied a legitimate, nondiscriminatory reason when an employee's unauthorized forwarding of emails caused it to lose "trust and confidence" in her).

Mathews does not dispute that Kärcher has proffered legitimate, nonretaliatory reasons, satisfying this element. Dkt. No. 35 at 17.

### 3. Evidence of Pretext

Because Kärcher demonstrated legitimate, nonretaliatory reasons for its adverse actions, the burden shifts back to Mathews to demonstrate either that (1) Kärcher's reasons for threatening termination, terminating him, and accelerating his termination are pretextual, or (2) although Kärcher's stated reasons are legitimate, retaliation nevertheless was a substantial factor motivating Kärcher. *Mackey*, 459 P.3d at 382. Mathews has met that burden with respect to his termination but not with respect to Choate's threat or Kärcher's acceleration of his termination.

Mathews argues that Kärcher has provided shifting reasons for his termination, thereby demonstrating pretext. Dkt. No. 35 at 18–19. "[F]undamentally different justifications for an employer's action [can] give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that neither of the official reasons was the true reason." *Washington v.*

1    *Garrett*, 10 F.3d 1421, 1434 (9th Cir. 1994). Mathews argues that although the stated reason for

2    his termination was the unauthorized training course charge, Choate told him that he was being

3    terminated because he had been "disrespectful" to her and then told a group of managers that he

4    had been terminated due to "irreconcilable differences" between the two of them. Dkt. No. 35 at

5    18–19; Dkt. No. 36 at 7.[12]

6           Kärcher argues that Choate's statements are hearsay and must be disregarded for purposes

7    of summary judgment, Dkt. No. 38 at 7, but the Court may consider evidence that can "'be

8    presented in a *form* that would be admissible' at trial," *Harlow v. Chaffey Cmty. Coll. Dist.*, No.

9    21-55349, 2022 WL 4077103, at *1 (9th Cir. Sept. 6, 2022) (emphasis in original) (quoting Fed.

10   R. Civ. P. 56(c)(2)). Federal Rule of Evidence 801(d)(2) provides a hearsay exception for

11   statements of a party opponent.

12          The Rule sets forth three elements necessary for admitting a statement that would
             otherwise be excluded as hearsay: (1) the statement must be made by an agent or
13           employee of the party against whom the statement is being offered; (2) the
             statement must concern a matter within the scope of that employment relationship;
14           and (3) the statement must be made while the declarant is yet employed by the
             party.

15   *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 999 (9th Cir. 2019). The first and third elements

16   are met because Choate was a Kärcher employee at the time she allegedly made the statements.

17   As for the second element, "a matter may fall within the scope of a declarant's employment even

18   though the declarant did not have final decision-making authority on that matter" if the person was

19   "involved in a process leading up to a challenged decision[.]" *Id.* Choate was not the decisionmaker

20   for Mathews' termination, but Kärcher contends that Mathews was discharged for a "series of

21   events" starting with his "open disrespect" for Choate. Dkt. No. 38 at 6. Choate was therefore

22

23   ───────────────

24   [12] During his deposition, Mathews stated that he could not recall if Choate told him he had been disrespectful or if the
     comment was relayed to him by other managers. Dkt. No. 26-1 at 49–50.

ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT - 20

involved in the process leading up to the termination: she was on the receiving end of Mathews' disrespect and communicated it to the decisionmakers, leading at least in part to his termination. And Mathews plans to call as a witness at trial the manager who allegedly heard the "irreconcilable differences" statement, so she can testify as to what she heard. Dkt. No. 26-1 at 50, 60. The Court therefore considers the statements for purposes of this motion.

However, even if the Court were to disregard Choate's statements, Mathews has still provided sufficient evidence of shifting explanations to survive this motion. Again, Kärcher contends that it discharged Mathews for the "series of events" that started with his disrespect for Choate in early 2019 and ended with his unauthorized tuition-reimbursement expense. Dkt. No. 38 at 6. But while Kärcher asserts that it "has never maintained that the unauthorized charge, by itself, was the reason for his discharge," *id.* at 7, its decisionmakers cite only the unauthorized charge, with the resulting loss of trust and confidence, as the reason they discharged Mathews, Dkt. No. 26-8 at 2; Dkt. No. 26-9 at 2. The decisionmakers do not state that Mathews' disrespect for Choate played any role. A reasonable jury could conclude that those shifting explanations suggest pretext.

Additional facts bolster that conclusion. First, the decisionmakers' declarations—which are almost identically worded—state that Mathews' actions caused them "to lose trust and confidence that Mr. Mathews was acting with Kärcher's best interests in mind, or that he was acting in good faith," but they do not explain why that is so. Dkt. No. 26-8 at 2; *see also* Dkt. No. 26-9 at 2. Kärcher suggests in its motion that the decisionmakers were worried about further unauthorized charges, Dkt. No. 26 at 20, but the declarations do not so state. Second, the decisionmakers explicitly stated that they decided to discharge Mathews because he incurred the charge "shortly after he received Kärcher's response letter of March 27, 2019." Dkt. No. 26-8 at 2; *see also* Dkt. No. 26-9 at 2. A reasonable jury could conclude that their reference to the response

to Mathews' complaint indicated that the complaint itself—or Kärcher's reaction to it—played a role in Mathews' termination. Under Kärcher's version of the facts, the parties were "negotiating [Mathews'] exit from the company" when he incurred the unauthorized charge, Dkt. No. 26 at 13, but exit was not the only option in Mathews' settlement offer, Dkt. No. 26-20 at 10–11 (seeking to either continue at the company without Choate as his supervisor or receive a severance). Third, as set forth above, the mere five weeks between Kärcher's receipt of Mathews' discrimination complaint and its decision to discharge him could support an inference of retaliation. *See, e.g.*, *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1069 (9th Cir. 2003) (explaining that in evaluating pretext, "it is improper to ignore the evidence in support" of a plaintiff's prima facie case). Finally, although Mathews did not follow the procedures to obtain preapproval of the SHRM class expense, the parties do not dispute that he had incurred—and Kärcher had reimbursed—his SHRM recertification class expenses in 2017 without preapproval or incident. Dkt. No. 36 at 9. Although Kärcher's financial outlook had deteriorated by 2019, its updated tuition reimbursement policy—promulgated in the wake of its decision to close the Camas facility—stated that employees could seek up to $5,250 each per calendar year, undermining its contention that incurring a $650 expense was financially problematic or indicative of irredeemably poor judgment. Dkt. No. 36-2 at 2–3, 6. According to Mathews, he believed at the time he incurred the charge that he would qualify for reimbursement under Kärcher's training programs, Dkt. No. 26-1 at 45–46; Dkt. No. 35 at 19–20. Mathews' version of the facts must be credited for purposes of this motion. Therefore, Mathews has presented sufficient evidence of pretext, and the Court denies Kärcher's motion for summary judgment regarding Mathew's retaliatory discharge claim.

However, Mathews fails to show that Choate's threat or the acceleration of his termination date was pretextual. Mathews does not argue that Kärcher's stated reason for the threat of termination in January 2019 was pretextual. To the contrary, he concedes that he refused to meet

with Choate during her January 2019 visit to Camas and that their relationship was "challenging." Dkt. No. 26-1 at 13; Dkt. No. 36 at 5. And the pretext section of his response brief does not address this issue. Dkt. No. 35 at 17–21. With respect to Kärcher's acceleration of the termination, Mathews does not dispute that he incurred a second unauthorized charge. His only argument in support of pretext is that Choate ultimately approved the $100 charge. Dkt. No. 35 at 21. But Mathews demanded that the company not deduct the amount from his paycheck and threatened to file a claim against the company if it did so. Dkt. No. 26-26 at 2. Paying the charge under those circumstances does not demonstrate pretext or undermine Kärcher's concerns about Mathews' repeatedly incurring unapproved charges. Because Mathews has not met his burden of demonstrating that Kärcher's stated reason for the alleged threat or accelerated termination was pretextual, Kärcher is entitled to summary judgment on these claims.

**E.      Mathews' Claim for Wrongful Discharge in Violation of Public Policy**

In Washington, "[a]n employer may discharge an at-will employee for 'no cause, good cause or even cause morally wrong without fear of liability.'" *Roe v. TeleTech Customer Care Mgmt. (Colo.) LLC*, 257 P.3d 586, 594–95 (Wash. 2011) (quoting *Thompson v. St. Regis Paper Co.*, 685 P.2d 1081, 1085 (Wash. 1984)). But a narrow exception to the at-will employment doctrine prohibits an employer from terminating an employee "for reasons that contravene a clear mandate of public policy." *Mackey*, 459 P.3d at 381 (cleaned up); *see also Becker v. Cmty. Health Sys., Inc.*, 359 P.3d 746, 749 (Wash. 2015).

Courts have generally limited public policy tort actions to situations in which the employee is discharged for (1) refusing to commit an illegal act, such as engaging in price fixing; (2) performing a public duty or obligation, such as serving jury duty; (3) exercising a legal right or privilege, such as filing a workers' compensation claim; or (4) engaging in "whistleblowing" activity. *Dicomes v. State*, 782 P.2d 1002, 1006–07 (Wash. 1989). If employees' claims fall into

one of the four *Dicomes* categories, they establish a prima facie case of wrongful discharge in violation of public policy by showing that (1) their discharge may have been motivated by reasons that contravene a clear mandate of public policy; and (2) their public-policy-linked conduct was a significant factor in the decision to terminate their employment. *Mackey*, 459 P.3d at 384; *Martin v. Gonzaga Univ.*, 425 P.3d 837, 844 (Wash. 2018). The *McDonnell Douglas* burden-shifting framework applies here, too. *Mackey*, 459 P.3d at 381; *Martin*, 425 P.3d at 844–45.

Mathews' claim falls into the third category. He alleges that Kärcher discharged him for complaining about discrimination, i.e., exercising a legal right. *See, e.g.*, Dkt. No. 35 at 22. The WLAD sets forth an "explicit, well-defined, and dominant public policy." *Int'l Union of Operating Eng'rs, Loc. 286 v. Port of Seattle*, 295 P.3d 736, 740 (Wash. 2013). Specifically, Section 49.60.210(1) of the Revised Code of Washington forbids employers from discharging or otherwise discriminating against an employee in retaliation for opposing any practices forbidden by the WLAD. For the same reasons set forth above, Mathews has created a genuine issue of material fact regarding whether his discharge was impermissibly motivated by retaliation, and Kärcher is not entitled to summary judgment on this claim.

**F.   Mathews' Negligence Claim**

Mathews' negligence claim is untenable. He has failed to support the claim he actually pleaded in his complaint.

1.   Mathews Impermissibly Introduces a New Theory of Liability in His Response Brief

Mathews impermissibly introduces a new theory of liability in his response brief: he asserted a negligence claim in his complaint, but he now asserts injury premised on intentional conduct. Dkt. No. 35 at 25. By failing to include this in his complaint, Mathews did not provide Kärcher with adequate notice of this theory of liability and cannot raise it for the first time at summary judgment. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968–69 (9th Cir.

2006) (citing Federal Rule of Civil Procedure 8(a)(2)). A litigant "may not effectively amend [his] Complaint by raising a new theory . . . in [his] response to a motion for summary judgment." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010).[13] [14]

## 2.   Mathews' Negligence Claim in His Complaint Is Unsupported

Mathews alleged in his complaint that Kärcher "breached its duties to Plaintiff by terminating his employment in violation of his rights" and "by failing to hire, supervise and train [its] agents and employees who were charged with [e]nsuring compliance with Plaintiff's rights." Dkt. No. 1-1 at 6. Mathews cannot sustain a negligent hiring claim because he has not provided any evidence—or even argued—that Kärcher knew Choate (or any other Kärcher employee) was unfit before they were hired. *See, e.g.*, *Preston v. Boyer*, No. C16-1106-JCC-MAT, 2019 WL 982041, at *3 (W.D. Wash. Feb. 7, 2019), *report and recommendation adopted*, 2019 WL 974623 (W.D. Wash. Feb. 28, 2019). Nor can his negligent training and supervision claims survive because those claims are viable only when employees act outside the scope of their employment. *See Horman v. Sunbelt Rentals, Inc.*, No. C20-564-TSZ, 2020 WL 4366185, at *6 (W.D. Wash. July

---

[13] Even if Mathews were permitted to assert his new theory, he has not supported it. The Washington Industrial Insurance Act ("IIA"), Wash. Rev. Code § 51.04 *et seq.*, immunizes employers from employees' tort claims arising from workplace injuries but provides an exception if the employer "intentionally injures an employee." *Vallandigham v. Clover Park Sch. Dist. No. 400*, 109 P.3d 805, 810 (Wash. 2005); *see* Wash. Rev. Code § 51.24.020; *see also Mason v. Kenyon Zero Storage*, 856 P.2d 410, 413, 415 (Wash. Ct. App. 1993) (allowing plaintiff to assert an intentional tort claim pursuant to Section 51.24.020 when a supervisor intentionally crushed him with a forklift). The IIA defines an "injury" as "a sudden and tangible happening, of a traumatic nature, producing an immediate or prompt result, and occurring from without, and such physical conditions as result therefrom." Wash. Rev. Code § 51.08.100. Mathews makes no attempt to bring his alleged injuries, which include economic harms, "humiliation[,] and indignity" within the scope of that definition, Dkt. No. 35 at 25, and those alleged injuries duplicate his alleged retaliation-related damages. Dkt. No. 1-1 at 6–7. Nor does Mathews demonstrate or argue that Choate intended to produce an injury. *Henson v. Crisp*, 946 P.2d 1252, 1253 (Wash. Ct. App. 1997) (the injury itself, "not merely the conduct," must be intentional;"[d]isregard of a known risk of harm is insufficient").

[14] The Court also notes that Mathews' brief spans 26 pages in violation of Local Civil Rule 7(e)(3), which limited opposition briefs to 24 pages. *See generally* Dkt. No. 35. His discussion of Kärcher's motion for summary judgment on his negligence claim begins on page 25. *Id.* at 25. Although the Court will not in this instance "refuse to consider any text, including footnotes, which is not included within the page limits," 2022 Local Civil Rule 7(e)(6), it cautions Mathews that it will not consider overlength or noncompliant submissions in the future.

30, 2020) (dismissing claims for negligent supervision and training when plaintiff alleged that the defendant's employees were acting in the course and scope of their employment); *Velasquez v. King Cnty.*, No. C19-745-RSM, 2020 WL 3451966, at *3 (W.D. Wash. June 24, 2020). Here, the parties agree that Choate was acting within the scope of her employment. Dkt. No. 35 at 25; Dkt. No. 38 at 10. Indeed, Mathews does not allege that any Kärcher employee was acting outside the scope of their employment.

As for the alleged "violation of his rights," because Mathews was an at-will employee, he has not shown that Kärcher owed him a duty apart from the WLAD not to threaten or discharge him. Dkt. No. 26-3 at 1 (Mathews' acknowledgement of at-will employment); *Nguyen v. Boeing Co.*, No. C10-415-MJP, 2010 WL 2102501, at *4 (W.D. Wash. May 25, 2010) (dismissing negligence claim when plaintiff failed to plead a duty). And Mathews cannot recover for a negligence claim that duplicates his retaliation claim. An employee may recover for claims of negligent infliction of emotional distress, negligent supervision, or negligent training only if the factual basis for the claim is distinct from the factual basis for the discrimination claim. *Capadanno v. AT&T Mobility Servs. LLC*, No. 2:20-CV-01690-MAT, 2022 WL 1227109, at *5 (W.D. Wash. Apr. 26, 2022) (holding that where the negligence claims duplicate the discrimination claims, the negligence claims must be dismissed); *see also Haubry v. Snow*, 31 P.3d 1186, 1193 (Wash. Ct. App. 2001); *Francom v. Costco Wholesale Corp.*, 991 P.2d 1182, 1193 (Wash. Ct. App. 2000). Here, Mathews' negligence claim is premised on the same facts as his retaliation claim, and it must be dismissed as duplicative. *Compare* Dkt. No. 35 at 13, 19 (alleging retaliation based on the January 2019 threat, his termination, and the acceleration thereof), *with id.* at 25 (alleging negligence based on the same facts).

Therefore, Kärcher is entitled to summary judgment on Mathews' negligence claim.

1

## III.   CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART Kärcher's motion for summary judgment. Dkt. No. 26. The Court grants summary judgment regarding Mathews' negligence claim and any retaliation claim based on a theory other than retaliatory discharge. Otherwise, Kärcher's motion is denied.

Dated this 9th day of May, 2023.

Lauren King
United States District Judge